UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

NOLA SMITH,

                        Plaintiff,

             v.

NORTH SHORE-LONG ISLAND
JEWISH HEALTH SYSTEM,

                      Defendant.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-04235 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Nola Smith commenced the above-captioned action on May 8, 2015, against

Defendant North Shore-Long Island Jewish Health System. (Compl., Docket Entry No. 1.)

Plaintiff filed an Amended Complaint on October 12, 2015, (Am. Compl., Docket Entry No. 26-

1), alleging claims for retaliation under the Family and Medical Leave Act, 29 USC § 2601 *et*

*seq.* ("FMLA"), and disability discrimination under the Americans with Disabilities Act, 42 USC

§ 12101 *et. seq.* ("ADA"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-

101, *et seq.* ("NYCHRL"). Defendant moves for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure. (Def. Mot. for Summ. J. ("Def. Mot."), Docket Entry No. 63;

Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 63-6.) For the reasons

discussed below, the Court grants in part and denies in part Defendant's motion for summary

judgment.

     **I.   Background**

       The following facts are undisputed except as otherwise noted. Plaintiff Nola Smith is a

registered nurse who was hired to work at Forest Hills Hospital (the "Hospital") on September

22, 2008.  (Def. Statement of Material Facts Pursuant to Local R. 56.1 ("Def. 56.1") ¶ 6, Docket

Entry No. 63-1.)  Defendant North Shore-Long Island Health System ("Defendant"), is a large

hospital system comprised of sixteen affiliate hospitals including the Hospital.  (*Id.* ¶ 2.)

Until her termination on August 23, 2013, Smith served as a nurse in the Ventilation Unit

of the Hospital's Medical Surgical Department as part of Unit 4N.  (*Id.* ¶ 6; Pl. Response to Def.

56.1 ("Pl. 56.1") ¶ 14, Docket Entry No. 66.)  During the course of her employment, Rhonnie

Jackson, the Hospital's Director of Patient Care Services, among others, supervised Smith.  (Def.

56.1 ¶ 8.)  Jackson oversaw the Hospital's Critical Care, Intensive Care ("ICU"), and Medical

Surgical Units.  (*Id.*)  Beginning in 2012, Jackson became Smith's direct supervisor, replacing

Rose Clarke, a nurse manager who had begun a series of intermittent leaves of absence.  (*Id.*)

Jackson, in turn, reported to Doreen O'Grady, the Hospital's Chief Nursing Officer.  (*Id.*)

### a.  Work schedule and absences from work

Throughout her employment, Smith suffered from various disabilities including

generalized anxiety disorder and panic attacks for which doctors have prescribed her a number of

medications over the years.  (Def. Response to Pl. 56.1 ("Def. 56.1 Resp.") ¶ 2, Docket Entry

No. 64-1.)  Due to these disabilities, the Hospital has accommodated Smith with a lighter work

schedule compared to other nurses.  All other nurses in Unit 4N worked a "flex" schedule,

defined as five thirty-six hour work weeks, consisting of three twelve hour days, followed by one

forty-eight hour work week, consisting of four twelve hour days.  (Def. 56.1 ¶ 7.)  In contrast,

Smith worked, at most, thirty-five hours per week and the Hospital gave her at least a temporary

reprieve from having to work the longer-hour weeks.  (*Id.*; Def. 56.1 Resp. ¶ 9.)

In addition, Smith was granted a three-month leave of absence from June 1, 2012 to

September 4, 2012 pursuant to the FMLA for a nervous breakdown she suffered allegedly as a

result of harassment by Clarke. (Pl. 56.1 ¶ 17; Def. 56.1 Resp. ¶ 4.) During the course of her employment, the Hospital granted Smith at least eight separate leave accommodations for various ailments, including her disabilities. (*Id.* ¶¶ 3, 11.) According to Defendant, its insurer Hartford administers FMLA leave, while the Hospital's Human Resources ("HR") department administers disability accommodations. (Pl. 56.1 ¶ 2; Deposition of Angela Fisher ("Fisher Dep.") 46:21 – 47:8, Docket Entry No. 68-7.)[1]

The Hospital has a sick leave guideline that automatically flags for discipline any nurse that has called in more than three times in a quarter. (Def. 56.1 Resp. ¶ 11; Deposition of Doreen O'Grady ("O'Grady Dep.") 32:20–24; 36:13–37:14, Docket Entry No. 68-6.) Although FMLA and other approved leaves are exempt from the policy, the Hospital generates a spreadsheet of nurses who fall within the guideline based solely on the total number of absences, regardless of the reason for absence. (Def. 56.1 Resp. ¶ 11; O'Grady Dep. 37:9–14.)

### b. Disciplines and other actions

According to Smith, after she returned from her FMLA leave in the summer of 2012, Jackson immediately began chastising her for taking leave. Because the spreadsheet includes both protected and unprotected leave, O'Grady instructed Jackson to check to ensure Smith's absences were not approved FMLA leave, (O'Grady Dep. 33:8–22), but she did not instruct Jackson to check whether Smith's absences were accommodations for a disability, (*id.* at 33:19–22). Pursuant to this policy, in October of 2012, Jackson appeared to have issued Smith a verbal

---

[1] During discovery in this litigation, the Hospital found out that Smith also worked as a nurse at Catholic Charities Home Care during her three-month leave of absence between June and September of 2012. (Def. 56.1 ¶ 26.) According to Smith, she only attended orientation, "a low energy affair," for her position at Catholic Charities Home Care while on FMLA leave from the Hospital. (Smith Aff. in Supp. of Pl. Opp'n ("Smith Aff.") ¶¶ 17–19, annexed to Pl. Opp'n as Ex. 2, Docket Entry No. 68-2.) However, Smith does not dispute that attending orientation constituted additional employment. (*Id.*)

warning — the first step in the Hospital's three-step Progressive Discipline Policy — for excessive leave. (*See* October 13, 2012 Email, annexed to Pl. Opp'n to Def. Mot. ("Pl. Opp'n"), Docket Entry No. 68, as Ex. 18, Docket Entry No. 68-18; October 1, 2012 Email, annexed to Pl. Opp'n as Ex. 19, Docket Entry No. 68-19; Deposition of Rhonnie Jackson Dep. ("Jackson Dep.") 55:3–56:17, Docket Entry No. 68-4.)

On December 26, 2012, O'Grady also instructed Jackson to discipline Smith again for calling in sick for a fourth time in the quarter. (December 26, 2012 Email, annexed to Pl. Opp'n as Ex. 20, Docket Entry No. 68-20.) Accordingly, Jackson drafted a written warning — the second step of the Progressive Discipline Policy — and scheduled a meeting with Smith for December 28, 2012. (Jackson Dep. 62:10–15; Disciplinary Warning Notice, annexed to Pl. Opp'n as Ex. 21, Docket Entry No. 68-21.) At the meeting, before Jackson could issue the Disciplinary Warning Notice, Smith complained that several of the absences listed as problematic were approved leave. (Def. 56.1 Resp. ¶ 10.) As a result, Jackson did not officially issue the written warning to Smith. (*Id.*) The Disciplinary Warning Notice noted that on September 13, 2012, the Hospital had issued Smith a verbal warning to improve her sick time. (Disciplinary Warning Notice.)

In addition to the formal discipline discussed above, Smith contends that her leaves of absence had been a continuing source of conflict with Jackson and others at the Hospital. Between July 6, 2012 and June 26, 2013, the Hospital denied Smith transfers to the ER or ICU units on five separate occasions. According to Smith, Jackson told her that her transfer requests were being denied because of excessive leave. (Deposition of Nola Smith ("Smith Dep.") 122:24–125:3; 178:24–179:16, Docket Entry No. 68-3.)

Smith also contends that she had a much more difficult time getting approved for job-

related conferences. (*Id.* at 138:7–24.) Smith and other nurses who work twelve-hour shifts are entitled to twenty-eight hours of paid conference leave per year. (Fisher Dep. 23:19–22.) Typically, nurses or their union pay for conferences upfront and then apply for reimbursement by submitting a certificate of attendance.[2] (Jackson Dep. 92:9 – 93:5; CBA, annexed to Pl. Opp'n as Ex. 26, Docket Entry No. 68-26.) If the Hospital chose to front expenses and wages for each day of attendance, and the nurse fails to attend the conference, the practice has been to "reverse the pay" or to use the employee's "accrued paid time off."[3] (Jackson Dep. 40:14–25; O'Grady Dep. 27:9–14; CBA at 8.)

As early as November of 2012, Smith complained to Jackson about this perceived differing treatment, telling him that she felt "singled out." (November 5, 2012 Email, annexed to Pl. Opp'n as Ex. 24, Docket Entry No. 68-24.) In particular, in early 2013, Jackson initially denied Smith's request to attend a two-day EKG conference to be held on February 7 and 14, 2013 ("February Conference"). (Def. 56.1 ¶ 15.) Although the Hospital had approved at least one other nurse from Unit 4N to attend the conference, Jackson denied Smith's request to attend the February Conference because the EKG conference involved subjects unrelated to Smith's "day-to-day nursing duties and [Smith's] patients did not involve or require EKGs." (Jackson Aff. in Supp. of Def. Mot. ("Jackson Aff.") ¶ 9, annexed to Def. Mot. as Ex. I, Docket Entry. No.

---

[2] Fisher testified that the reimbursement policy in the Collective Bargaining Agreement ("CBA") is limited to conference expenses rather than wages for each day of attendance. (Fisher Dep. 24:9–20.) According to the Hospital, as a matter of practice, the Hospital credits nurses with attending a conference and pays wages accordingly during the relevant pay period. (Fisher Dep. 25:15 – 26:24; O'Grady Dep. 26:19–25.)

[3] Fisher testified that the Hospital only gave employees the option of using their accrued paid time off if they had already exhausted their conference time. (Fisher Dep. 27:10–16.) However, Fisher acknowledged that the CBA did not include such a limitation. (*Id.* at 28:10–18.)

63-3; Jackson Dep. 81:6–10.)  After discussing the matter further with the union for nurses, Jackson subsequently approved Smith's request.  (Jackson Dep. 80:17–81:4.)  However, Smith was scheduled to work the night shift from 7 PM to 7 AM the morning of the first day of the conference set to begin at 9 AM, two hours after the end of the shift.  (Smith Dep. 136:19–22; Smith Aff. in Supp. of Pl. Opp'n ("Smith Aff.") ¶ 5, annexed to Pl. Opp'n as Ex. Ex. 2, Docket Entry No. 68-2.)  Because of the short turnaround between the end of her shift and the scheduled start time of the conference, Smith requested that Jackson remove her from the shift because she could not otherwise attend the conference.  (Jackson Dep. 81:20–22; Jackson Aff. ¶ 10.)  Jackson told Smith that she needed to switch her schedule with someone else.  (Jackson Aff. ¶ 10.)  Smith was unable to find anyone willing to switch schedules with her and therefore worked her scheduled shift and did not attend the conference.  (Jackson Aff. ¶ 10; Smith Aff. ¶ 8.)  Although Smith never submitted a certificate of attendance for the February Conference, (Jackson Aff. ¶ 11), the Hospital paid for the conference days as if she had attended.  (*Id.*)  Smith assumed that the pay was for accrued paid time off.  (Smith Dep. 149:22–25.)

On July 1, 2013, Smith submitted another request to attend a conference in October of 2013.  (Def. 56.1 ¶ 18; July 1, 2013 Conference Request Form, annexed to Pl. Opp'n as Ex. 28, Docket Entry No. 68-28.)  Jackson denied the request and explained to Smith that she had already attended the February Conference earlier in the year.  (Jackson Dep. 84:4–9; Pl. 56.1 ¶ 18.)  Smith responded that she had not attended the February Conference and that Jackson and Benson Matthews, Smith's union representative, already knew that to be the case.  (Jackson Dep. 85:7–24; Pl. 56.1 ¶ 18.)  Jackson denied having such prior knowledge and told Smith he would be reporting the incident to HR.  (Jackson Dep. 86:9–17.)  According to Smith, at the end of the conversation, Jackson stated: "I know what you did last time.  You caused me to become short

staffed. No one crosses me and gets away with it."[4] (Smith Dep. 168:7–10.)

Subsequently, Jackson emailed Anthony Lumia, a HR representative, and requested to speak with him regarding Smith and "theft of time." (July 31, 2013 Email, annexed to Pl. Opp'n as Ex. 29, Docket Entry No. 68-29.) Following this email exchange, Lumia conducted an investigation, consisting almost exclusively of conversations with Smith and Jackson. (Deposition of Anthony Lumia ("Lumia Dep.") 25:17–21.) During his conversation with Lumia, Jackson stated that Smith had accepted pay for a conference she did not attend and had failed to report her nonattendance. (Jackson Dep. 99:2–4.) Jackson also had a similar conversation with O'Grady. (O'Grady Dep. 58:3–15.) The Hospital terminated Smith on August 23, 2013. (Jackson Aff. ¶ 14.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the

_____

[4] The quoted language from Smith's deposition testimony differs slightly from that provided in the pleadings. (*See, e.g.*, Am. Compl. ¶ 16.)

plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not

sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after

resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational

juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.

2000).

### b. FMLA retaliation claims

Smith asserts claims for retaliation under the FMLA for the denial of her transfer requests

and her termination.[5] (Pl. Opp'n 10.) Defendant argues that these claims fail because Smith

cannot make out a prima facie case of discrimination or demonstrate pretext.[6] (Def. Mem. 6–7.)

"The FMLA gives eligible employees an 'entitlement' to twelve weeks per year of unpaid

leave '[b]ecause of a serious health condition that makes the employee unable to perform the

functions of the position of such employee.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174

---

[5] Defendant acknowledged that the denials of her transfer requests are separate bases for Smith's retaliation claims. (*See* Def. Reply in Supp. of Def. Mot. ("Def. Reply") 4 n.2, Docket Entry No. 64.)

[6] Smith has consistently only advanced claims for retaliation based on alleged punishment for exercising her FMLA rights. (*See generally* Am. Compl.; Pl. Opp'n.). While including a passing reference to an interference claim based on a "discouragement theory" in her Opposition brief, Smith only did so in support of a retaliation claim. (*See* Pl. Opp'n 12.); *Aycock v. Bank of Am., N.A.*, No. 14-CV-2789, 2015 WL 3746997, at *5 (W.D. Tenn. May 28, 2015) ("[M]ere references to statutes, without an explanation of which factual allegations supposedly support a claim under the statutes, are not sufficient to state a cause of action."); *Hunter v. D.C.*, 534 F. Supp. 2d 70, 71 (D.D.C. 2008) ("[I]t is clear that mere references to statutes in a complaint without any allegations as to how these statutes were violated cannot meet even Rule 8's liberal requirement of "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2)."); *see also Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 136, 144 (D. Conn. 2014) ("[C]ourts in the Second Circuit require a Plaintiff who asserts a FMLA interference claim on a 'discouragement theory' to offer evidence that she tried to assert her FMLA rights and was thereafter discouraged from taking FMLA leave" or that "the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." (citation omitted)).

(2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)).  It "'creates a private right of action to seek both equitable relief and money damages against any employer . . .' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights."  *Id.* (quoting *Nev. Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003)).  "The Second Circuit recognizes distinct claims of interference and retaliation under the FMLA."  *Sista*, 445 F.3d at 175; *see also Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) ("FMLA claims come in at least two varieties: interference and retaliation." (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004))).  Retaliation claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subject to some adverse employment action by the employer."  *Woods*, 864 F.3d at 166.

"At the summary judgment stage, retaliation claims brought pursuant to the FMLA are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)."  *Alexander v. The Bd. of Educ. of City of New York*, 648 F. App'x 118, 121 (2d Cir. 2016).  Under that framework, a plaintiff must first establish a prima facie case of discrimination.  *Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).  A plaintiff's burden at this stage is "minimal."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).  If a plaintiff meets her burden at this stage, the burden shifts to the defendant-employer to "demonstrate a legitimate, non-discriminatory reason for its actions."  *Graziado*, 817 F.3d at 429; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015).  If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff-employee to show that the defendant-employer's reason was pretext.  *Graziado*, 817 F.3d at 429; *see also Sista*, 445 F.3d at 169 ("A plaintiff must establish a prima facie case; the employer must offer through the

introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.").

### i. Plaintiff has established a prima facie case for retaliation

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168; *see also Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 F. App'x 41, 44 (2d Cir. 2014) (citing same); *Donnelly v. Greenburg Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151 (2d Cir. 2012) (citing same). The plaintiff "must demonstrate that [her] taking FMLA leave constituted 'a negative factor in [the defendant's] decision to terminate' . . . her." *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 207 (D. Conn. 2012) (citing *Sista*, 445 F.3d 176); *see also Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (holding that the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking leave pursuant to the FMLA").

The first two elements of the prima facie framework are undisputed. Smith exercised her rights under the FMLA when she took leave on eight separate occasions. (Def. 56.1 ¶¶ 3, 11.) Defendant also does not dispute that Smith was qualified for her position. (*See* Def. Mem. 7 n.1 (challenging qualifications only as defined under the ADA but not the FMLA); *see also Donnelly*, 691 F.3d at 151 ("[The] qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job."). However, while Defendant concedes that Smith's termination is an adverse employment action, Defendant argues that the denials of her

transfer requests are not.  Defendant also argues that the adverse employment actions did not take place under circumstances giving rise to an inference of discrimination.

### 1.  The denials of transfer constitute an adverse employment action

Defendant disputes that the denials of Smith's requests to transfer to other departments at the Hospital are adverse employment actions.  (Def. Mem. 8–9.)  Defendant argues that the transfers would not have provided Smith any immediate tangible benefits, most notably an increase in salary.  (Def. Reply 5.)  Smith argues that the transfer requests were to departments that are more prestigious, and would have conferred lasting benefits for her career.  (Smith Aff. ¶ 3.)

For purposes of FMLA retaliation claims, an adverse employment action is "any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising h[er] legal rights."  *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011).  "[T]he test is whether a 'reasonable' employee would be deterred, and does not take into consideration a plaintiff's 'unusual subjective feelings.'"  *Dearden v. GlaxoSmithKline LLC*, No. 15-CV-7628, 2017 WL 4084049, at *8 (S.D.N.Y. Sept. 14, 2017) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006)).[7]  "'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims."  *Millea*, 658 F.3d at 165 (quoting *Burlington*, 548 U.S. at 68).  "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial

_____

[7]  In *Millea v. Metro-N. R. Co.*, 658 F.3d 154 (2d Cir. 2011), the Second Circuit adopted the Title VII adverse employment standard for retaliation claims for FMLA retaliation claims.  Therefore, the Court may rely on Title VII retaliation cases in analyzing adverse employment actions in the FMLA retaliation context.  *See id.*; *Dearden v. GlaxoSmithKline LLC*, No. 15-CV-7628, 2017 WL 4084049, at *8 (S.D.N.Y. Sept. 14, 2017).

in gross' as to be actionable." *Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir. 2010) (citation omitted).

Under this standard, denials of transfer may constitute adverse employment actions even if the change in position would not have been accompanied by *immediate* higher compensation, tangible benefits or opportunities for advancement. *See Millea*, 658 F.3d at 164 (holding that actionable acts of retaliation therefore do not have to "relate to the specific terms and conditions of the employee's employment."); *see also Beyer v. Cty. of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008) ("The *denial* of a transfer may constitute an adverse employment action [if] . . . the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability."); *Abrams v. Connecticut*, No. 09-CV-00541, 2015 WL 4459540, at *7 (D. Conn. July 21, 2015) ("A substantial body of case law supports the proposition that denial of a transfer to a materially more prestigious position constitutes an adverse employment action."); *Cadet v. Deutsche Bank Sec. Inc.*, No. 11-CV-7964, 2013 WL 3090690, at *8 (S.D.N.Y. June 18, 2013) (finding lack of assignment to "live deals" to qualify as an adverse employment "since such exposure was integral for career advancement").

Smith requested transfers to the ICU and ER, more specialized and prestigious units compared to the Medical Surgical Department. Defendant does not dispute Smith's characterization of the ICU and ER units, but instead argues that the transfers in and of themselves were not materially advantageous in terms of immediate tangible benefits, most notably an increase in salary.[8] (Def. Reply in Supp. of Def. Mot. ("Def. Reply") 5, Docket Entry

---

[8] Defendant's assertion that Smith's affidavit contradicts her deposition testimony on this issue is meritless. (Def. Reply 3.) Contrary to Defendant's assertion, Smith has never asserted

No. 64).  However, because a transfer to a more prestigious position could constitute an adverse

employment action, a jury could reasonably conclude that the denials of transfer to the ER and

ICU units were adverse employment actions — likely to dissuade "a reasonable [employee] in

[Smith's] position, considering all the circumstances," from exercising her FMLA rights.  *See*

*Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (holding

whether reassignment constituted a materially adverse action "depends upon the circumstances

of the particular case"); *Bobo v. Wachovia Sec., LLC.*, No. 107-CV-01056, 2010 WL 1186455, at

*4 (N.D.N.Y. Mar. 23, 2010) (finding transfer to be adverse employment action where plaintiff

offered "some evidence that the [new branch] was less prestigious").

### 2.   Smith has established a causal relationship between the adverse employment actions and her protected leave

Defendant argues that there is no evidence indicating a causal connection between

Smith's exercise of her FMLA rights and the denials of transfer and her termination.  (*Id.* at 7–

11.)  Defendant largely relies on its history of accommodating nurses and Smith in particular to

support this argument.  (Def. Mem. 9–10.)  Defendant also argues that Smith's evidence is

largely uncorroborated.  (*Id.* at 4.)  Smith contends that the retaliatory explanations and threats

by Jackson along with Defendant's long history of punishing her for taking protected leave are

sufficient to establish an inference of discrimination.  (Pl. Opp'n 11–15.)

The Second Circuit has held that in retaliation claims, a causal connection can be shown

---

that a transfer to the ICU or ER would have resulted in an increase in pay.  Instead, Smith has
consistently maintained that there are other benefits from transferring to such units beyond
immediate increases in pay, tangible benefits, or advancement.  (*Compare* Smith Dep. 85:17–20
("[M]oving to an ICU position is more of a specialty . . . . [I]t's good to move into specialty areas
of interest in the hospital") *with* Pl. Aff. 3 ("Granting such transfers would have provided greater
opportunities for my career advancement because the ICU and ER are more specialized and
prestigious than the Medical Surgical Department.").)

either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct;[9] or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Littlejohn v. City of New York*, 795 F.3d 297, 307, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "Direct evidence may . . . include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have 'enormous influence in the decision-making process.'" *Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 WL 5036970, at *4 (S.D.N.Y. Aug. 26, 2015); *see also Knox v. Town of Se.*, No. 11-CV-8763, 2014 WL 1285654, at *13 (S.D.N.Y. Mar. 31, 2014) ("In determining whether a remark is probative, courts consider four factors: (i) who made the remark . . . ; (ii) when the remark was made in relation to the employment decision at issue; (iii) the content of the remark . . . ; and (iv) the context in which the remark was made . . . ."), *aff'd*, 599 F. App'x 411 (2d Cir. 2015). Indirect evidence may include a "showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also, e.g.*, *Feingold v. New York*, 366 F.3d 138, 156–157 (2d Cir. 2004) ("[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." (collecting cases)); *Nonnenmann v. City of New York*, 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May 20,

---

[9] Disparate treatment evidence is but one type of circumstantial evidence that may be relied upon to establish a prima facie case of retaliation or discrimination. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("And as with the first stage of *McDonnell Douglas,* [plaintiff] is not required to provide evidence that similarly situated men were treated differently.").

2004) ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))). A history of prior discrimination may also serve as circumstantial evidence of a causal connection. *See Jordan v. Cty. of Chemung*, 264 F. Supp. 3d 497, 507 (W.D.N.Y. 2017) ("At the *prima facie* stage, . . . employer penalties for absences which were permitted by FMLA [may give rise to a retaliatory inference]." (citations omitted)); *Hinton v. City Coll. of New York*, No. 05-CV- 8951, 2008 WL 591802, at *24 (S.D.N.Y. Feb. 29, 2008) (finding probative senior colleagues' irritation at plaintiff's history of employment complaints); *see also Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 117 (1st Cir. 2013) (finding history of "disability-based conflict" to be probative of presence of discriminatory animus for ADA claim); *United States ex rel. Cody v. ManTech Int'l Corp.*, 260 F. Supp. 3d 556, 562 (E.D. Va. 2017) (finding "history of disputes and disagreements" to be probative of retaliatory animus in *qui tam* action).

## A. Direct evidence of causal connection

Smith provides direct evidence of a causal connection in the form of statements made by Jackson. In her sworn deposition, Smith explained that Jackson expressly told her that her transfer requests were denied because of excessive leave. *See Dupee v. Klaff's, Inc.*, 462 F. Supp. 2d 233, 243 (D. Conn. 2006) (finding explanation that plaintiff was being fired "because he 'had too many doctors appointments'" to be direct evidence of retaliatory action); *see also* (Def. 56.1 ¶ 5 ("[C]ompleted transfer applications are assessed based on seniority, credentials, and *disciplinary histories*." (emphasis added)).) In addition, Smith also stated that Jackson threatened her at the conclusion of their final argument preceding the investigation and

termination — stating that he would get even with her for causing him to be short-staffed while she was on leave.[10]  *See Orlando v. BNP Paribas N. Am., Inc.*, No. 14-CV-4102, 2015 WL 6387531, at *14 (S.D.N.Y. Oct. 22, 2015) (finding threats against plaintiff to be "sufficient direct

---

[10]  Defendant argues that Jackson's statements are irrelevant because they were made by "a supervisor who had no decision making role in [Smith's] termination." (Def. Reply 6.) However, discriminatory comments and actions by a supervisor, without formal firing authority, who "ha[s] enormous [or substantial] influence in the decisionmaking process," constitutes direct evidence of discrimination. *See Rose v. New York City Bd. of Educ.,* 257 F.3d 156, 162 (2d Cir. 2001); *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 55–56 (2d Cir. 1998) (noting that comments made by a non-decisionmaker constituted evidence of discrimination because a jury might determine the comments reflected a company policy of discrimination); *Owens v. New York City Housing Auth.,* 934 F.2d 405, 410 (2d Cir. 1991) (finding that statements made by individuals with "substantial influence" over the plaintiff's employment raised an issue of fact regarding discrimination), *cert. denied,* 502 U.S. 964 (1991); *Rosen v. Thorburgh,* 928 F.2d 528, 534 (2d Cir. 1991) (concluding that the finder of fact could determine that the plaintiff was wrongfully terminated due to religious bias, where the ultimate decisionmaker was unaware of the plaintiff's religion, because biased supervisors may have influenced the decision); *see also Sadki v. Suny Coll. at Brockport*, 310 F. Supp. 2d 506, 513 (W.D.N.Y. 2004) ("There is considerable authority, however, from this circuit and others, that the element of causation . . . can be satisfied by showing that a person with discriminatory animus toward the plaintiff influenced the 'actual' decisionmaker, even if the latter did not consciously discriminate against the plaintiff.").

During his deposition, Jackson testified it would have been improper for him to use the term "theft of time" when communicating with HR because Smith's actions could only be so characterized after an investigation. (Jackson Dep. 99:1–9.) Despite this acknowledgment, in his initial email to Lumia to request an investigation, Jackson appeared to share his conclusion that Smith had committed theft of time, stating that he "need[ed] to speak to [Lumia] about [Smith] regarding theft of time." (July 31, 2013 Email; *see also* Lumia Dep. 28:6–10.) A reasonable trier of fact could find Jackson's *opinion* to have influenced not only the investigation but the ultimate adverse employment action. *See Sadki*, 310 F. Supp. 2d at 515 ("[T]he extent to which [the chair of the department's] opinion influenced [a dean's] decision about whom to recommend is for the trier of fact to decide."). Indeed, Lumia appeared to have only conducted interviews of Smith and Jackson — crediting Jackson's version of the events. (Lumia Dep. 25:20–21); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) ("We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of 'fault.'"). The deposition testimony of Lumia and O'Grady also confirm that Jackson's testimony of the events was likely the *deciding factor* for Smith's termination. (*See* Lumia 46:9–47:10; O'Grady Dep. 47–51.) In fact, O'Grady at times testified that it was her belief that the investigation was conducted by *both* Jackson and HR. (*See* O'Grady Dep. 50:15–18.) In addition, Defendant concedes that Jackson is one of the ultimate decision-makers for requests to transfers. (Jackson Aff. ¶ 8.)

16

evidence of retaliatory animus to establish a causal connection and demonstrate pretext, thereby precluding summary judgment").  While Jackson did not necessarily specify the nature of the leave involved, Smith testified that she understood him to be referring to her disability based leave.  (Smith Dep. 58:11–19.)  A reasonable jury could credit Smith's testimony and readily conclude that retaliatory animus motivated Defendant's adverse employment actions towards her. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) (holding uncorroborated discriminatory comments may "constitute 'direct evidence' . . . adequate to make out a prima facie case"); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001) (finding plaintiff's largely uncorroborated accounts to be sufficient to raise a genuine issue of fact as to the defendant's intent); *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 410 (2d Cir. 1991) (stating that employer's contention that plaintiff's proffered evidence of discriminatory comments "is uncorroborated and not credible is a jury argument inappropriate on a motion for summary judgment").

### B.  Circumstantial evidence of causal connection

Smith also provides circumstantial evidence of retaliatory animus based on the disciplinary action taken against her pursuant to the Hospital's policy.[11]  In order to ameliorate staffing issues, Defendant employs a "guideline" or policy that automatically flags for discipline any nurses who call out of work more than three times in a quarter.[12]  (O'Grady Dep. 37:4–14.)

---

[11]  Smith did not expressly make any arguments based on temporal proximity for the denials of transfer or her termination.  Here, the prior history of formal and informal punishment serves as circumstantial evidence because they are not directly related to the adverse employment actions at issue — the denials of transfer and termination.

[12]  While O'Grady disputes the characterization of the guideline as a policy, Defendant itself uses the terms interchangeably.  (*Compare* O'Grady Dep. 37:9–12 *with* Def. 56.1 Resp. at 11.)

The spreadsheet generated pursuant to this policy does not differentiate between protected and unprotected leave. Therefore, the sick days must be manually reviewed to ensure nurses are not disciplined for taking FMLA or disability based leave. (*See* O'Grady Dep. 33:4–22.) Once identified for discipline, nurses are typically subject to a three-step Progressive Discipline Policy. Because short staffing due to sick leave has been a "big program at the [H]ospital," O'Grady directed Jackson to discipline several nurses, including Smith. (O'Grady Dep. 32:22–24, 36:13–24.)

Pursuant to this policy, on September 13, 2012, Smith appears to have been given a verbal warning — the first step in the Hospital's three-step Progressive Discipline Policy — to "improve [her] sick time."[13] (Disciplinary Warning Notice.) Defendant did not provide any evidence of any unapproved leave by Smith between September 4, 2012, the date she returned to work after FMLA leave, and September 13, 2012, the date of the written warning. Based on this record, a reasonable juror could conclude that the Hospital disciplined Smith on September 13, 2012 for her three-month FMLA leave.

The Hospital may have also given Smith another verbal warning in October of 2012 for excessive leave. (*See* October 13, 2012 Email; October 1, 2012 Email.) Defendant contends that any discipline in October could not have been for FMLA leave because Smith had already used up all of the FMLA leave she was entitled to between June 1, 2012 and September 4, 2012. (Def. 56.1 Resp. at 8–9.) Defendant appears to cite to a list of accommodations that it provided

---

[13] In all the submissions, neither party addressed the verbal warning dated September 13, 2012 discussed in the written warning prepared by Jackson for the December 28, 2012 disciplinary meeting. (*See* Disciplinary Warning Notice.) Instead, the parties only disputed whether Jackson had given a verbal warning sometime in October of 2012. Therefore, it is unclear whether the warning on September 13 is actually the October warning in dispute or a separate incident. Given the lack of clarity, the Court construes the evidence in favor of the non-movant.

to Smith over the years in support of this argument.  (*See* Def 56.1 ¶ 11.)  However, Defendant does not represent the list to be exhaustive as to intermittent leave.  (*See id.* ("[U]pon return from her three month leave of absence, [Smith] requested and was granted numerous intermittent FMLA leaves . . . , *including* intermittent leaves on . . ." (emphasis added).)  Without additional evidentiary support, the Court cannot conclude that Smith did not have any FMLA leave available to her in October to further conclude that Smith could not have been disciplined in October for taking FMLA leave.[14]

Further, in December of 2012, Defendant attempted to discipline Smith for excessive leave.  On December 26, 2012, O'Grady summarily instructed Jackson by email to "[p]lease discipline" Smith for calling out sick for the fourth time in the quarter — without any accompanying request to review the absences for any approved leave.  (December 26, 2012

---

[14]  Based on the Court's independent review of the record, Defendant may be relying on a letter from Hartford insurance dated September 27, 2012 discussed in Smith's deposition.  (*See* Smith Dep. 99–102.)  During the deposition, Defendant's counsel represented that the letter purported to state that Smith "had no FMLA time left, because [she] had not worked sufficient hours in the prior [twelve] months."  (*Id.* at 102:20–23.)  However, Defendant did not attach nor reference the Hartford letter in its submissions.  Nor can Defendant rely on Smith's testimony to support its argument that she had no additional FMLA leave.  (Smith Dep. 102.)  Although Defendant's counsel explained the purported contents of the Hartford letter, Smith did not acknowledge the substance as described.  Instead, Smith merely stated that she "[did not] recall having a communication with [Hartford]" about the matter discussed therein.  (*Id.* at 102:20–25.)

Because there are four different ways in which a twelve-month period for FMLA leave may be calculated, *see Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 354 (S.D.N.Y. 2007) ("In order to ascertain the twelve-month period after which an employee must reestablish eligibility, [four] different computation methods may be employed, namely: (1) the calendar method; (2) the fixed period; (3) the '12-month period measured forward' method; and (4) the 'rolling backward' method."), the Court cannot conclude based on the record before it that Smith had already used up her leave for the calendar year.  *Id.*  The Court cannot determine that there was no FMLA leave available in October 2012 without the information as to which method of calculation is being employed by Defendant.  In addition, Defendant never denied that the dates on the Disciplinary Warning Notice included approved FMLA or disability-based leave, allowing for the inference that Plaintiff had more leave available to her for the calendar year.

Email; *see also* June 25, 2013 Email, annexed to Pl. Opp'n as Ex. 39, Docket Entry No. 68-39.) Based on this instruction, Jackson prepared a Disciplinary Warning Notice — the second step of the Progressive Discipline Policy — and scheduled a disciplinary meeting with Smith for December 28, 2012.[15]  (Jackson Dep. 62:10–15.)  At the meeting, Jackson attempted to give Smith the Disciplinary Warning Notice until Smith objected and pointed out to Jackson that at least a few of the absences listed in the warning had been for FMLA approved leave.[16]  (*Id.*)  At the very least, based on Defendant's blanket policy of flagging nurses for discipline solely because of the number of absences, and Jackson's attempt to discipline Smith for taking FMLA leave, a reasonable juror could conclude that key decisionmakers had a tendency to view and treat all leave in the same manner — failing to distinguish between protected and unprotected leave unless expressly challenged to do so.  *See Donnelly*, 691 F.3d at 152 (finding negative evaluations based on excessive absences, including those taken pursuant to FMLA leave, to be sufficient basis to allow a jury to determine retaliatory intent); *Millea*, 658 F.3d at 161 ("There is no dispute that a company may discipline an employee for violating its internal leave policy as

---

[15]  At her deposition, Smith appeared to testify that the Disciplinary Warning Notice was not the written warning that Jackson tried to give her at the December 28, 2012 meeting.  (Smith Dep. 99:14–19.)  However, at this point in the litigation, both parties appear to acknowledge that the Disciplinary Warning Notice was, in fact, the written warning that Jackson tried to give Smith at the meeting.  (*See* Pl. Response to Def. 56.1 ("Pl. 56.1") ¶ 12, Docket Entry No. 66.)

[16]  Jackson testified that that he believed he had checked the dates to ensure that they were not FMLA approved absences, (Jackson Dep. 64:12–20), and, based on his review, he did not believe that the days listed on the Disciplinary Warning Notice were FMLA approved leave, (*id.* at 64:21–25).  However, Defendant has not provided sufficient evidence for the Court to conclude that the days listed on the Disciplinary Warning Notice were not FMLA leave.  As discussed earlier, Defendant has only argued that Smith had no more FMLA leave left in October.  (*See* Def. 56.1 Resp. at 8–9.)  In addition, Defendant has not represented that its list of accommodations that it provided to Smith in its Rule 56.1 statement is exhaustive.  (*See* Def 56.1 ¶ 11.)  Therefore, the Court cannot determine whether the days listed on the Disciplinary Warning Notice were FMLA leave or not by cross-referencing Defendant's Rule 56.1 statement.

long as that policy is *consistent* with the [FMLA]." (emphasis added)). Had Smith not objected to the FMLA approved leave included in the Disciplinary Warning Notice, she would have been punished for taking protected FMLA leave.

In addition to formal discipline, Smith also asserts that Defendant punished her for taking leave by making it more difficult for her to attend various job-related conferences. As early as November 4, 2012, Smith complained that she felt she had been "singled out" and required to fulfill a much more "elaborate" approval process as part of her request to attend a conference in mid-November. (November 5, 2012 Email.) Subsequent to this complaint, Jackson denied Smith's request to attend the February Conference. (Jackson Aff. ¶ 9.) Jackson denied the request stating that the conference was unrelated to Smith's "day-to-day nursing duties and patients did not involve or require EKGs," (Jackson Dep. 80:17–81:4), but at least one other nurse in Smith's unit had been approved to attend the conference, and Defendant has not provided any information to show that that nurse had different job duties or patients with different needs from Smith, despite being in the same unit,[17] (*id.* at 81:6–10). Based on the Hospital's approval for another nurse in Unit 4N to attend the conference, a reasonable jury could find that the Hospital denied Smith conference days because of excess leave as Smith claims, rather than her day-to-day nursing duties or patients as argued by Defendant.

### C. History of prior punishment supports Smith's account of Jackson's statements and actions

The above history of prior punishment also lends credence to Smith's testimony about Jackson and the statements he purportedly made. In addition to direct evidence of statements reflecting animus, Smith has provided circumstantial evidence of prior formal and informal

---

[17] The fact that Smith's union intervened and eventually Smith was approved to attend the conference does not change this analysis. (Jackson Dep. 80:17–81:4.)

punishment because of taking protected leave.  While Jackson's statements are uncorroborated, Smith has provided evidentiary support suggestive of Defendant's general distaste for leave *and* an inability or unwillingness to distinguish between protected and unprotected leave on occasion. In particular, Defendant's disciplinary policy for sick leave based solely on the number of absences, O'Grady's email to Jackson to punish Smith without any accompanying instruction to ensure her absences were not protected, and Jackson's attempt to discipline Smith for FMLA leave on December 28, 2012, suggest an often too eager willingness or desire to punish employees for any and all leave — potentially leading to resentment and punishment, even if unintentional, for protected leave.  *See Esser v. Rainbow Advert. Sales Corp.*, 448 F. Supp. 2d 574, 582 (S.D.N.Y. 2006) (denying summary judgment of retaliation claim where parties disputed the reason for defendant's "irritation" at plaintiff).  Furthermore, the final dispute leading to Smith's discharge also arose from her desire to attend a conference — a prior source of conflict stemming allegedly from disagreements over leave.

Under these circumstances, a reasonable factfinder could find Smith's termination to be "a disingenuous overreaction to justify dismissal of an annoying employee who asserted [her] rights under the [FMLA]."  *Kelley*, 707 F.3d at 118 (quoting *Miller v. Ill. Dep't of Transp.,* 643 F.3d 190, 200 (7th Cir. 2011)).  Considering all the evidence in the aggregate, Smith has established a causal connection between her FMLA leave and Defendant's decision to deny transfers and terminate her.

### ii.  Defendant has articulated non-discriminatory reasons for the adverse employment actions

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action."  *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 845 (2d Cir. 2013) (citing *United States*

*v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)). An employer's "explanation of its reasons must be clear and specific" in order to "afford the employee a full and fair opportunity to demonstrate pretext." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (citation omitted). "Where an employer's explanation, offered in clear and specific terms, 'is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn.'" *Id.* (alterations omitted) (quoting *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980)).

Defendant has sufficiently articulated legitimate, non-retaliatory reasons for the denials of transfers and her termination. As to the denials of transfer, Defendant has presented evidence that the Hospital denied Smith's requests because of failures to follow application requirements, lack of open positions, and the hiring of a more senior employee as required by the CBA. (Jackson Aff. ¶ 8.) Defendant also presents evidence that the Hospital lawfully terminated Smith for theft of time pursuant to an independent investigation. (*Id.* ¶¶ 12–15.)

### iii. Smith has demonstrated pretext as to the rationales provided for termination and one of the denials of transfer

"A plaintiff may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (quoting *Kwan*, 737 F.3d at 846); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

## 1. Smith has demonstrated that the proffered rationale for termination is pretextual

Construing the evidence in the light most favorable to Smith, she has demonstrated that Defendant's proffered rationale for her termination is pretextual.

According to Defendant, Smith committed time theft because she waited five months before informing anyone that she had not attended the February Conference. (Jackson Aff. ¶ 5.) However, Smith provides evidence that Jackson was aware of her nonattendance from the very beginning. Before the start of the first day of the conference, Smith was scheduled to work a twelve-hour shift starting at 7 PM the night before and ending at 7 AM the morning of the scheduled conference. (Smith Dep. 136:19–22; Jackson Aff. ¶ 10.) Because the conference started at 9 AM, Smith requested that Jackson change her shift since she otherwise would not be able to attend the conference. (Jackson Aff. ¶ 10.) Jackson refused and told Smith that she needed to switch her shift with another nurse. Smith was unable to switch, worked the night shift, and did not attend the conference. (*Id.*) Jackson acknowledges that it is his responsibility to inform payroll of switches and therefore should have at least been aware of any switch or lack thereof. (*See* Jackson Dep. 31:17–25.) Based on these facts, a reasonable juror could infer that Jackson was aware that Smith failed to attend the first day of the February Conference as early as February 6 or February 7. Furthermore, in an email dated February 19, 2013, Jackson appears to acknowledge some concern that Smith may not have attended the conference. (February 19, 2013 Email, annexed to Pl. Opp'n as Ex. 25, Docket Entry No. 68-25 ("I am going to ask [Smith] for confirmation that she attended the conference or I will reverse the pay."); *see also* Jackson Aff. ¶ 11.)

Moreover, the manner in which nurses are normally paid for attending conferences also supports an inference that the termination is pretext. Under the CBA, *reimbursement* for

conference attendance is subject to the "submission of appropriate documentation including receipts." (CBA at 53.) According to Jackson, nurses or their union usually pay for conference expenses in advance, and then apply for reimbursement of the costs incurred through the submission of a certificate of attendance. (Jackson Dep. 92:9–93:5.) Failure to submit the necessary documentation within thirty days of attending the conference could result in the waiver of any rights to obtain reimbursement. (Jackson Dep. 96:4–10.) If Defendant pays the nurses wages in advance, and the nurse fails to attend the conference, the practice has been to reverse the payment or to use the employee's accrued paid time off.[18] (Jackson Dep. 40:14–22.) Smith never submitted a certificate of attendance. (Jackson Aff. ¶ 11.) Jackson states in his affidavit in support of Defendant's summary judgment motion that Smith declined to provide a certificate of attendance for the conference, despite his numerous requests for her to do so. (*Id.*) In contrast, during his deposition, Jackson stated that he did not recall whether he had a conversation with Smith about her nonattendance at the February conference prior to the July of 2013 meeting. (Jackson Dep. 86:21–87:3.) However, even crediting Jackson's statement in his affidavit, Jackson fails to explain why he neither reversed the pay nor reported Smith to HR much earlier than August of 2013, more than five months after the conference. (*See* February 19, 2013 Email; Jackson Dep. 97:8–21 (explaining that nurses should inform him of failure to attend a conference within a week or so and that he would report to HR a failure to do so).) In light of these discrepancies, a reasonable jury could find that Smith did not engage in any misconduct, and

---

[18] As discussed earlier, this policy would appear to apply to both conference expenses and wages for the days attended.

Defendant's stated rationale for termination implausible.[19]

### 2. Smith fails to demonstrate pretext as to four of five denials of her transfer requests

Smith requested transfers from Medical Surgical Department to the ER or ICU units on five separate occasions: (1) July 6, 2012; (2) October 12, 2012; (3) January 4, 2013; (4) June 21, 2013; and (5) June 26, 2013. As discussed below, Smith fails to establish pretext for four of the denials of her transfer requests. However, she has sufficiently demonstrated pretext for the January 4, 2013 denial.

### A. Smith has failed to establish pretext as to four of the transfers

Smith submitted her July 6, 2012 transfer request by email without a completed application and, as a result, the Hospital denied the application. (July 6, 2012 Email, annexed to Def. Mot. as Ex. U, Docket Entry No. 63-4.) In addition, Smith failed to include the required position numbers in the October 12, 2012 and June 26, 2013 applications and the Hospital denied those applications. (October 12, 2012 Application, annexed to Def. Mot. as Ex. V, Docket Entry No. 63-4; June 26, 2013 Application, annexed to Pl. Mot. as Ex. 23, Docket Entry No. 68-23.) Although there is no requirement in the CBA that an application be filled out completely, as to the October 12, 2012 request, Smith was notified by email that the application could not be processed due to the lack of a position number and was also informed that there was no position

---

[19] The termination write-up, a document purporting to memorialize the relevant details of the termination, authored by Lumia, the investigator of Smith's alleged "theft of time," also appears to be directly contradicted in parts by Jackson's testimony. (*See* Interview of RN Nola Smith on August 14, 2013 Memorandum, annexed to Pl. Opp'n as Ex. AA, Docket Entry No. 63-5.) For example, Lumia wrote that Smith had not spoken with "her Director, Rhonnie Jackson, or anyone else about her problem with working the night before the conference. . . ." (*Id.*) In contrast, Jackson testified that he informed Smith to switch with someone else. (Jackson Aff. ¶ 10.)

available.[20]  (*See* October 12, 2012 Email, annexed to Def. Mot. as Ex. V, Docket Entry No. 63-4; Article VI(A): Posting of Positions, annexed to Pl. Mot. as Ex. 13, Docket Entry No. 68-13.)  Despite being on notice that she needed to provide a position number based on the October 12, 2012 denial, Smith failed to complete the June 26, 2013 application.  Finally, the Hospital filled the June 21, 2013 position with an employee with seniority, consistent with the CBA requirements.  (June 21, 2013 Application, annexed to Def. Mot. as Ex. W, Docket Entry No. 63-4.)  Smith offers no evidence to suggest that the she had an "appreciable difference in experience and preparation for the position" that would allow for Defendant awarding the position to her instead of the individual with seniority.  (Article VI(A): Posting of Positions.)  Nor does Smith provide any other evidence of pretext as to the denial of these transfer requests.

Indeed, the evidence supports the conclusion that retaliation played no role in the denials of these transfer requests.  Although Smith argues that Jackson denied her transfer requests because of excessive leave, (*see* Smith Dep. 178:24–179:16 (complaining to Kapochunas, an HR representative, that Jackson had been denying her transfers because of excessive leave)), the record indicates that Jackson never even reviewed three of the four transfer requests.  (*See* July 6, 2012 Application; October 12, 2012 Application; *see also* June 26, 2013 Application (having the same procedural issues that led Kapochunas to summarily deny the October 12, 2012 Application).)  Instead, Kapochunas, the HR representative to whom Smith complained, appears to have been the individual who effectively denied her requests for various inadequacies.  (*See* July 6, 2012 Application; October 12, 2012 Application; June 26, 2013.))  Further, the Hospital filled the position that Smith sought in her July 21, 2013 Application, the only transfer request

---

[20]  Smith has not presented any evidence to suggest that there was a position open at the time of the October 12, 2012 request.

that Jackson admits to reviewing, with a nurse with seniority as required by the CBA. (*See* July 21, 2013 Application.) The record establishes as a matter of law that retaliation did not play any role in the Hospital's denials as to these four requests to transfer.

### B. Smith has shown pretext as to the denial of the January 4, 2013 application

On January 4, 2013, Smith applied for a transfer to the ICU. (January 4, 2013 Application, annexed to Pl. Mot. as Ex. 22, Docket Entry No. 68-22.) The Hospital denied Smith's request but offers no reason for the denial of this application other than the fact that the "Employee Information" section was not fully completed. (*See* Def. Reply 5.) This rationale, however, may be contradicted by the October 12, 2012 transfer application that was completed in a similar manner but was denied for a different reason, without any mention of incomplete "Employee Information." (October 12, 2012 Application.) In denying the October 12, 2012 transfer application, Defendant did not object to the fact that that application did not include a complete "Employee Information" section. (October 12, 2012 Email.) The Hospital rejected the October 12, 2012 transfer application because of the lack of a position number and the lack of an open position. (*Id.*) Nor does the CBA require a completed application. The only difference in the "Employee Information" sections of the two applications are that they each include one detail that the other does not. While the October 12, 2012 application includes information about the "Current Working Days," the January 4, 2013 application includes a completed category for "Shift/Hours." (*See* October 12, 2012 Application; January 4, 2013 Application); *see also DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir. 1993) (stating that pretext inquiry takes into consideration "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination"). Based on these facts, a reasonable juror could conclude that the proffered reason for denying the January 4, 2013 application was "either a *post hoc*

fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Accordingly, Smith has demonstrated pretext as to her January 4, 2013 transfer request and her termination. Therefore, the Court denies summary judgment as to those FMLA claims but grants summary judgment as to the other denials of transfer claims.

### c. ADA disability discrimination claim

Smith argues that Defendant discriminated against her because of her disability by denying her transfers and terminating her for taking protected leave — the accommodation for her generalized anxiety order and panic attacks. (Pl. Opp'n 3, 24.) Because the asserted discrimination is based on the accommodation of leave, Smith's ADA disability claim mirrors her FMLA claim. Likewise, as with Smith's FMLA claims, Defendant contends that Smith cannot establish a prima facie case of ADA discrimination or demonstrate pretext.[21] (Def. Mem. 6–12.)

Claims of employment discrimination under the ADA are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp.,* 411 U.S. 792. *See Sista,* 445 F.3d at 169. Under the framework, a plaintiff must first establish a prima facie case of discrimination. *St. Mary's Honor Ctr.,* 509 U.S. at 506; *see also Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 491 (2d Cir. 2010). A plaintiff's burden at this stage is "minimal" *Holcomb,* 521 F.3d at 139 (quoting *Hicks,* 509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory

---

[21] The Court declines to consider Smith's hostile environment claim, raised for the first time in her opposition brief. *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (affirming district court's decision not to consider new claims raised for the first time in opposition to summary judgment (citations omitted)).

reason for its actions. *Hicks,* 509 U.S. at 506–07; *Ruiz,* 609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.,* 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd* 461 F. App'x 59 (2d Cir. 2012). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves,* 530 U.S. at 142 (quoting *Hicks,* 509 U.S. at 509). If the defendant offers a legitimate, nondiscriminatory explanation for its action, the court must nevertheless deny summary judgment if the plaintiff can show that the explanation was pretext.

### i. ADA prima facie case

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. New York City Dep't of Educ.,* 804 F.3d 231, 235 (2d Cir. 2015); *see also Dooley v. Jet Blue Airways Corp.,* 636 F. App'x 16, 21 (2d Cir. 2015) (quoting *Davis,* 804 F.3d at 235) (outlining the requirements of a prima facie case under the ADA). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include standing, lifting, bending, speaking, and working. *Id.* § 12102(2)(A); *see also Dooley,* 636 F. App'x at 21; *Parada v. Banco Industrial De Venezuela, C.A.,* 753 F.3d 62, 66 (2d Cir. 2014).

Similar to the FMLA claim, the first two elements of the ADA prima facie framework are undisputed. Defendant is subject to the ADA and Smith is disabled within the meaning of the

statute.  *See Fronczak v. New York State Dep't of Corr. Servs.*, 2 F. App'x 213, 217 (2d Cir. 2001)

("One definition of 'disability' under the ADA is 'being regarded as having . . . an impairment'

that 'substantially limits one or more of the major life activities of such individual.'" (quoting 42

U.S.C. § 12102(2)(C)).  Defendant argues, however, that Smith fails to meet the last three

requirements necessary to establish a prima facie case.

### 1.  Smith is qualified within the meaning of the ADA

Defendant argues that Smith is not qualified to perform the essential functions of her job

with or without reasonable accommodation.  Defendant contends that Smith *admitted* that she

could not perform the essential duties of her employment when the disputed employment actions

took place.  (Def. Mem. 7 n.1.)  Defendant does not otherwise provide any further support or

explanation for its argument that Smith is not qualified to perform her job duties.  Smith disputes

admitting that she was unable to perform her duties and argues that she is qualified to do so

within the meaning of the ADA with the reasonable accommodation of intermittent leave.  (Pl.

Opp'n 24.)

A "qualified individual with a disability" is someone who "with or without reasonable

accommodation, can perform the essential functions of the employment position that such

individual holds or desires."  42 U.S.C. § 12111(8); *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229

(2d Cir. 2017).  The requested accommodation must be reasonable and connected to the

plaintiff's disability.  *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir. 1995); *see

also Scalera v. Electrograph Sys., Inc.,* 848 F. Supp. 2d 352, 367 (E.D.N.Y. 2012) ("[T]here must

be some sort of causal connection between the Plaintiff's disability and the requested

accommodation.").  A "reasonable accommodation may include, *inter alia,* modification of job

duties and schedules, alteration of the facilities in which a job is performed, acquisition of

devices to assist the performance of job duties, and, under certain circumstances, 'reassignment

to a vacant position.'" *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (citations omitted). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment." *Id.*

The Second Circuit has yet to definitively decide whether paid or unpaid leave may be considered a reasonable accommodation. *See Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 7 (2d Cir. 2014) ("[W]e have never resolved the question of whether paid or unpaid leave can constitute a reasonable accommodation under the ADA" (citation omitted)). However, the Second Circuit acknowledged that "[m]ost other circuits and the Equal Employment Opportunity Commission have concluded that, in some circumstances, an unpaid leave of absence can be a reasonable accommodation under the ADA." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 185 (2d Cir. 2006) (citing the First, Sixth, Seventh, and Ninth Circuits). In light of the weight of persuasive authority, district courts within the Second Circuit have held that leave may be a reasonable accommodation in certain contexts. *See Green v. Cellco P'ship*, 218 F. Supp. 3d 157, 164 (D. Conn. 2016); *Sobhi v. Sociedad Textil Lonia Corp.*, No. 13-CV-8073, 2014 WL 7474338, at *5 (S.D.N.Y. Dec. 30, 2014).

Defendant appears to argue that Smith is not qualified within the meaning of the ADA because she could not work when symptomatic. As discussed above, Defendant has neither provided any evidentiary support nor explanation for its argument that Smith was not qualified. (*See* Def. Mem. 7 n.1.) However, in its Rule 56.1 statement, Defendant cites to Smith's deposition testimony in support of its assertion that she "testified that [her disability] rendered her completely unable to do her job." (*See* 56.1 ¶ 9; Smith Dep. 76.) In one of the cited to portions of her deposition, Smith testified that she could not work when she was experiencing a

"depressive episode." (Smith Dep. 76:7–9.) Smith explained that the Hospital provided her intermittent leave as an accommodation when she could not work because of her disability. (Smith Dep. 69:17–20.) Defendant does not challenge any other aspect of Smith's work performance. With accommodations in the form of intermittent leave, Smith worked for five years for Defendant without incident. Prior to her termination, the only issues on record regarding Smith's work performance are interpersonal problems with her supervisor and disciplinary action for excessive leave.[22] (*See* 56.1 ¶ 10.) Therefore, if intermittent leave constitutes a reasonable accommodation, Smith is qualified to perform her job duties within the meaning of ADA.

Here, Defendant has neither argued that intermittent leave cannot be a reasonable accommodation in general nor specifically as to Smith. Moreover, O'Grady, the Chief Nursing Officer, the final authority on termination decisions, testified that she viewed leave to be a reasonable accommodation. (O'Grady Dep. 21:22–24; 28:18–21.) Indeed, the Hospital has accommodated Smith with intermittent leave for her disability. (*See* Smith Dep. 69:17–20; Def. Rule 56.1 ¶ 11); *but see Exarhakis v. Visiting Nurse Serv. of New York*, No. 02-CV-5562, 2006

---

[22] The Court did not consider whether Smith's *excessive* absenteeism eliminated her ability to perform the essential functions of her employment because Defendant did not make this argument. Courts have consistently held regular attendance to be an essential function of employment. *See, e.g., Reddick v. Niagara Mohawk Power Co.*, No. 08-CV-0995, 2010 WL 5185098, at *6 (N.D.N.Y. Dec. 16, 2010) ("To be sure, there is a plethora of cases supporting the contention that excessive absenteeism eliminates an essential function of employment — attendance — and therefore such absenteeism does not constitute a reasonable accommodation as a matter of law." (citations omitted)); *Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209, 221–22 (E.D.N.Y. 2007); *Mazza v. Bratton*, 108 F. Supp. 2d 167, 175 (E.D.N.Y. 2000), *aff'd*, 9 F. App'x 36 (2d Cir. 2001). However, an argument based on excessive absenteeism is inconsistent with Defendant's arguments in this litigation. Defendant has consistently insisted that Smith's absences played no role in the adverse employment actions — leading to the inference that her absences were not considered excessive to the point of preventing her from fulfilling the essential functions of her employment.

WL 335420, at *9 (E.D.N.Y. Feb. 13, 2006) ("[W]here an employer has accommodated an employee in excess of what the law requires, the discontinuance of those extraordinary accommodations cannot give rise to an ADA violation." (citations omitted)).  Because Defendant has proffered no argument to conclude otherwise, the Court finds Smith to be qualified within the meaning of the ADA with the reasonable accommodation of intermittent leave.[23]  (*See generally* Def Mem.; Def. Reply.)

### 2.  The denials of transfers constitute adverse employment actions under the ADA

Defendant argues that the denials of transfers are not adverse employment actions within the meaning of the ADA.  (Def. Mem. 8–9.)  As in the response to Smith's FMLA claims, Defendant asserts that the denied transfers would not have conveyed any immediate benefits, including most notably in terms of an increase in pay.

Under the ADA, "[a] plaintiff suffers an adverse employment action when she experiences a materially adverse change in the terms and conditions of employment."  *Dechberry v. N.Y.C. Fire Dep't*, 124 F. Supp. 3d 131, 147 (E.D.N.Y. 2015) (citation and internal quotation marks omitted).  Employment actions "deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Beyer*, 524 F.3d at 163 (alteration and internal quotation marks omitted); *see also Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 56 (2d Cir. 2016) (citing *Beyer*, 524 F.3d at 163) (explaining what conduct constitutes an adverse employment action).  The definition of an adverse employment

---

[23]  The Court notes that Defendant did not challenge Smith's reduced weekly work load as undermining her argument that she is qualified within the meaning of the ADA.

action is narrower for discrimination claims as compared to retaliation claims. *See Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 439 (E.D.N.Y. 2015) ("Unlike claims of discrimination, which limit what qualifies as an 'adverse employment action' to changes in the terms and conditions of employment, adverse employment actions in the context of a claim of retaliation are much broader." (citation omitted)).

For the same reasons discussed above in addressing Smith's FMLA retaliation claims, the denials of transfers are adverse employment actions. Denials of transfer to a more prestigious position constitutes adverse employment action even in the context of disability discrimination claims despite the narrower definition as compared to retaliation claims. *See Beyer*, 524 F.3d at 165 (holding that denial of transfer to more prestigious position could constitute an adverse employment action in the context of a Title VII discrimination claim); *Abrams*, 2015 WL 4459540, at *7 (collecting cases); *see also Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 78, n.6 (D. Conn. 2014) ("Courts use the same definition for 'adverse employment actions' in discrimination cases brought under the ADA [and Title VII]."); *Noon v. Int'l Bus. Machines*, No. 12-CV-4544, 2013 WL 6504410, at *6, n.4 (S.D.N.Y. Dec. 11, 2013) ("Courts use the same definition for 'adverse employment action' in discrimination claims brought under the ADA [and] Title VII").

### 3. Smith may have been discriminated against because of her disability

Defendant argues that Smith cannot establish a causal connection between her disability and the adverse employment actions because the denials of transfer and termination did not occur under circumstances giving rise to an inference of discrimination. (Def. Mem. 6–7.) Defendant argues that the Hospital's history of accommodating Smith for every requested leave supports a finding that there was no disability discrimination. (*Id.*) Defendant also asserts that no one at

the Hospital had notice of Smith's disability.  (Def. Reply 4.)

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'"  *Howard v. MTA Metro–N. Commuter R.R.,* 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir. 1996)).  "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination."  *Moore v. Kingsbrook Jewish Med. Ctr.,* No. 11–CV–3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted).  An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in . . .  degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted), or by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group," *Abdul–Hakeem v. Parkinson,* 523 F. App'x 19, 20 (2d Cir. 2013) (quoting *Ruiz,* 609 F.3d at 493).  "In determining whether a genuine issue of material fact exists for trial," a court is obliged to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

### A.  A reasonable jury could conclude that Defendant had knowledge of Smith's disability

A plaintiff must "adduce evidence raising a material issue of fact regarding [the] defendant's knowledge of her disability."  *Volmar v. Cold Spring Hills Ctr. for Nursing &*

*Rehab.*, 395 F. App'x 795, 796 (2d Cir. 2010); *see also Mitchell v. Shane*, 350 F.3d 39, 48–49 (2d Cir. 2003) (holding, in the Title VII context, that the plaintiffs failed to establish a prima facie case "because there is no evidence that the [defendants] had any knowledge of the [plaintiffs'] racial background"). "The notice requirement is rooted in common sense. Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (quoting *Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001)); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) (noting the impossibility of an employer basing an adverse employment decision on disability if it were "truly unaware that such a disability existed"); *McCoy v. Morningside at Home*, No. 11-CV-2575, 2014 WL 737364, at *4 (S.D.N.Y. Feb. 25, 2014) ("[C]ausation [ ] necessarily incorporates an inquiry as to whether the employer had notice of the plaintiff's disability."), *aff'd*, 601 F. App'x 57 (2d Cir. 2015). Moreover, "[a]n employer's awareness that a plaintiff suffered some injury does not establish that an employer had notice that the plaintiff was disabled." *McCoy*, 2014 WL 737364, at *4.

There is sufficient evidence in the record from which a reasonable factfinder could infer Defendant had notice that Smith's various leaves of absence were because of a disability. Prior to taking her extended leave in June 2012, Smith submitted an "Employee Injury/Illness Occurrence Report" to Jackson, later forwarded to O'Grady, explaining that she had suffered a "nervous breakdown" and was experiencing other symptoms necessitating visits to her cardiologist and medical doctor. (Employee Injury/Illness Occurrence Report, annexed to Pl. Opp'n as Ex. 11, Docket Entry No. 68-11; June 22, 2012 Email Regarding Nervous Breakdown, annexed to Pl. Opp'n as Ex. 12, Docket Entry No. 68-12.) The report also specifically notes that the injury has been an "ongoing issue for the past two years" — suggestive of a long-term

ailment.  Smith also testified that her doctors were in direct communication with the Hospital about her disabilities which appear to be corroborated by documentation provided by her physicians to requests made by the Hospital.  (Smith Dep. 65:18 – 66:8; April 16, 2012 Letter from Dr. Kassan, annexed to Pl. Opp'n as Ex. 16, Docket Entry No. 68-16; February 17, 2012 Letter re: Reasonable Accommodation Request, annexed to Pl. Opp'n as Ex. 17, Docket Entry No. 68-17; *see also* Fisher Dep. 46:21 – 47:8.)

### B.  Smith has demonstrated an inference of discrimination because of protected leave based on the denials of transfer and termination

An employer takes action because of disability where he acts based on conduct caused by the handicap.  *See Teahan v. Metro-N. Commuter R.R. Co.*, 951 F.2d 511, 516 (2d Cir. 1991) ("[A]n employer 'relies' on a handicap when it justifies termination based on conduct caused by the handicap.").  Therefore, if "absences were a manifestation of . . .  a disability[,] they cannot be separated from the disability itself."  *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 112-CV-00258, 2015 WL 12733387, at *15 (N.D.N.Y. Mar. 26, 2015).  With this understanding, courts have found discrimination where a claimant suffered adverse employment actions for absences caused by her disability.  *See id.*; *Morris v. City of New York*, 153 F. Supp. 2d 494, 502 (S.D.N.Y. 2001) ("Where the employer was aware that an employee's absences were related to a disability, however, the employee's attendance record may be an impermissible pretext for the employee's disability.");  *Barnett v. Revere Smelting & Ref. Corp.*, 67 F. Supp. 2d 378, 392 (S.D.N.Y. 1999) ("[W]here an employer asserts excessive absenteeism as a non-discriminatory justification for an employee's termination, that justification cannot analytically be considered apart from the alleged disability causing the absenteeism.").

For substantially the same reasons as discussed above as to Smith's FMLA claims, Smith has demonstrated an inference of disability discrimination.  As discussed earlier, Smith has

provided sufficient direct and circumstantial evidence for a reasonable jury to conclude that she was denied transfers and terminated because she exercised her rights to FMLA leave — which she took because of her disability. Furthermore, O'Grady admitted she never instructed Jackson to check whether Smith's absences were accommodations for a disability prior to requesting that Jackson discipline Smith for her absences. (O'Grady Dep. 33:19–22.) Therefore, Smith may have been disciplined for taking approved disability leave in addition to her disability-related FMLA leave. Because the absences were the "manifestation" of her disability, Smith has demonstrated a sufficient causal connection between her disability and the adverse employment actions.

### ii. Legitimate nondiscriminatory reason

As with Smith's FMLA retaliation claims, Defendant has sufficiently articulated legitimate nondiscriminatory reasons for the denials of transfer and termination — incomplete applications, seniority policy and theft of time.

### iii. Pretext

Because of the same inconsistencies discussed in addressing Smith's FMLA claims, the Court finds that Smith has demonstrated that the reasons offered for her termination and the denial of her January 4, 2013 transfer application, to be pretextual. *See Baron v. Advanced Asset & Prop. Mgmt. Sols., LLC*, 15 F. Supp. 3d 274, 283–84 (E.D.N.Y. 2014) ("An employment discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action . . . ."). In addition, for the same reasons discussed in addressing her FMLA claims, the Court also finds that discrimination played no role in the denials of the other transfer

applications.[24]  Accordingly, the Court denies summary judgment as to Smith's ADA

discrimination claim based on her termination and her January 4, 2013 transfer request but grants

the motion for summary judgment as to her discrimination claim based on the denials of the

other transfer applications.

### d.  NYCHRL disability discrimination claim

Smith also asserts the same disability discrimination claim under the NYCHRL.

Likewise, Defendant asserts the same defenses in response.  Because NYCHRL claims are

scrutinized under a more lenient standard than claims under the ADA, the Court analyzes

Smith's "NYCHRL claims separately and independently . . . construing [its] provisions 'broadly

in favor of discrimination plaintiffs to the extent that such a construction is reasonably

possible.'"  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (second alteration

in original) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d

Cir. 2013)).

Although NYCHRL discrimination claims must be analyzed separately from federal and

state discrimination claims, such claims are evaluated using a "similar framework."  *Id.* "[T]he

plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer

legitimate reasons for its actions."  *Id.* (citing *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d

112, 124 (App. Div. 2011)).  If the defendant meets that burden, then "summary judgment is

---

[24]  The Second Circuit has yet to determine whether the "but for" causation standard or
the "motivating factor" standard applies to this final stage for claims brought pursuant to the
ADA.  *See Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 353 (E.D.N.Y. 2014) ("[T]he question
of whether the heightened, but-for standard of causation . . . applies to claims asserted under the
ADA, is one that has not yet been addressed by the Second Circuit." (citation omitted)); *but see
Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (holding that plaintiff's ADA claim
could "succeed if she were able to show that discriminatory animus played a motivating role").
Because the Court concludes that Smith cannot meet even the lesser, mixed-motive standard, the
Court declines to reach the question of which standard should apply.

appropriate if 'the record establishes as a matter of law' that discrimination *or* retaliation 'play[ed] no role' in the defendant's actions." *Id.* (first quoting *Mihalik*, 715 F.3d at 110 n.8; and then citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n.27 (App. Div. 2009)). However, even under this more liberal standard, a plaintiff must "show that he 'has been treated less well at least in part '*because of*' [his disability].'" *Mathew v. N. Shore-Long Island Jewish Health Sys., Inc.*, 582 F. App'x 70, 71 (2d Cir. 2014) (quoting *Mihalik*, 715 F.3d at 110); *see also White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 133 (2d Cir. 2015) ("[T]hough we must construe NYCHRL claims more liberally than federal and state law claims, NYCHRL similarly only prohibits discrimination in the 'terms, conditions or privileges of employment' when such discrimination is 'because of' a protected characteristic." (quoting N.Y.C. Admin. Code § 8-107(1)(a) and citing *Mihalik*, 715 F.3d at 109)).

As discussed above, Smith has presented sufficient evidence from which a reasonable jury could conclude that Defendant terminated her and denied her January 4, 2013 transfer application because of her disability. Also consistent with the prior analysis, Defendant has demonstrated that "discrimination [or retaliation] play[ed] *no* role" in the denials of the other transfer requests. *Krasner v. City of New York*, 580 F. App'x 1, 3 n.2 (2d Cir. 2014).

### e. After-acquired evidence doctrine

Defendant argues that any damages should be limited because of the now unearthed evidence that Smith worked for another employer while on extended FMLA leave. (Def. Mem. 13.) Between June 1, 2012 and September 2012, the period of her FMLA leave, Smith worked at Catholic Charities Home Cares, attending orientation once per month in preparation for more extensive work responsibilities. (Smith Aff. ¶ 17.) According to Defendant, Smith violated the Hospital's leave of absence policy by failing to obtain permission before taking on additional

employment.  (Kapochunas Aff. in Supp. of Def. Mot. ("Kapochunas Aff.") ¶ 6, annexed to Def.

Mot. as Ex. GG, Docket Entry. No. 63-5.)

Under the after-acquired evidence doctrine, evidence that an employee would have been

terminated for lawful reasons may render her ineligible for front-pay and reinstatement and limit

back pay to the period between the unlawful termination and the date on which the discovery

was made.  *McKennon v. Nashville Banner Publ. Co.,* 513 U.S. 352, 362–363 (1995).  Courts

have applied the doctrine to claims arising out of various statutes including the FMLA, ADA,

and NYCHRL.  *See Adduci v. Yankee Gas Servs. Co.*, 207 F. Supp. 3d 170, 183 (D. Conn. 2016)

(applying doctrine to ADA claims); *Hillman v. Hamilton Coll.*, No. 95-CV-1442, 1998 WL

166827, at *10 (N.D.N.Y. Apr. 9, 1998) (applying doctrine to FMLA claims); *Baldwin v.

Cablevision Sys. Corp.*, 888 N.Y.S.2d 1, 6–7 (2009) (assuming application of doctrine to

NYCHRL for calculation of damages).  For the doctrine to apply, an employer "must first

establish that the wrongdoing was of such severity that the employee in fact would have been

terminated on those grounds alone if the employer had known of it at the time of the discharge."

*McKennon*, 513 U.S. at 362–63.  However, summary judgment is inappropriate if the plaintiff is

able to "raise a material issue of fact as to whether the after-acquired evidence would actually be

a basis for termination."  *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 212 (E.D.N.Y. 2009)

(quoting *Greene,* 218 F. Supp. 2d at 413).

Defendant fails to establish that the Hospital would have terminated Smith for working

during her prolonged FMLA leave without first seeking permission.  While the FMLA does not

expressly prohibit "moonlighting," FMLA regulation 825.216(e) allows an employer to

"continue to apply" "a uniformly-applied policy governing outside or supplemental

employment" to an employee on FMLA leave.  Thus, Smith was required to follow Defendant's

policy.  By failing to seek permission before working for Catholic Charities Home Care, Smith

violated Defendant's leave of absence policy.  (*See* Leave of Absence Policy, annexed to Def.

Mot. as Ex. FF, Docket Entry No. 63-5.)  Nevertheless, Defendant concedes that Smith *may* have

been terminated for this violation.  (*See* Def. 56.1 ¶ 28; Kapochunas Aff. ¶ 6.)  Because it is

unclear whether the Hospital would have terminated Smith, the Court cannot conclude that the

wrongdoing was of such severity that she *would have* been terminated.  Summary judgment as to

damages is therefore inappropriate under these circumstances.

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion

for summary judgment.  The Court grants summary judgment as to the July 6, 2012, October 12,

2012, June 21, 2013, and June 26, 2013 denials of transfer claims under the FMLA, ADA, and

NYCHRL.  The Court denies summary judgment as to Plaintiff's termination and January 4,

2013 denial of transfer claims under the FMLA, ADA, and NYCHRL.


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated: February 26, 2018
      Brooklyn, New York